UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN CHRISTIAN WILSON,

Plaintiff,

v.                                           Civil Action No. 22-3062 (ABJ)

FEDERAL BUREAU OF INVESTIGATION,

Defendant.

**REPLY IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

**Table of Contents**

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 2

I.    The Bureau Conducted an Adequate Search for Potentially Responsive Records ............. 2

    A.    The Bureau's Search Terms Were Reasonably Calculated to Identify All Potentially Responsive Records. ............................................................................................... 2

    B.    The Court Should Deny Plaintiff's Demand for Searches of Other Locations....... 3

    C.    Plaintiff's Reliance on a Bureau Declaration in a Different Case Is Inapposite..... 5

II.   The Bureau's *Glomar* Responses Are Appropriate and Should Be Upheld ................... 8

    A.    The Bureau's Glomar Responses Are Not a Shield to Avoid Producing Records.  8

    B.    The Bureau's Declaration Sufficiently Justifies the Agency's *Glomar* Response. 10

CONCLUSION................................................................................................................. 12

## Table of Authorities

**Cases**

*Agility Pub. Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313 (D.D.C. 2015) . 2

*Am. Chem. Council, Inc. v. HHS*, 922 F. Supp. 2d 56 (D.D.C. 2013) ............................................. 5

*Bigwood v. Dep't of Def.*, 132 F. Supp. 3d 124 (D.D.C. 2015) ...................................................... 2

*Cato Institute v. FBI*, Civ. A. No. 20-3338 (JEB) ......................................................................... 8

*Davis v. Dep't of Justice*, 460 F.3d 92 (D.C. Cir. 2006)................................................................ 5

*Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926 (D.C. Cir. 2012) ...................................................... 10

*Freedom Watch, Inc. v. NSA*, 197 F. Supp. 3d 165 (D.D.C. 2016) .............................................. 11

*Heffernan v. Azar*, 317 F. Supp. 3d 94 (D.D.C. 2018) .................................................................. 2

*Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771 (D.C. Cir. 2002) ....................................... 2

*Judicial Watch v. Dep't of Justice*, No. 22-5209, 2023 WL 4397354 (D.C. Cir. July 7, 2023)..... 9

*Judicial Watch, Inc. v. Dep't of State*, 177 F. Supp. 3d 450 (D.D.C. 2016).................................. 5

*Kalu v. IRS*, 159 F. Supp. 3d 16 (D.D.C. 2016)............................................................................. 9

*Lee v. Geren*, 480 F. Supp. 2d 198 (D.D.C. 2007) ...................................................................... 10

*Liberation Newspaper v. Dep't of State*, 80 F. Supp. 3d 137 (D.D.C. 2015) ................................ 2

*SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197 (D.C. Cir. 1991) ...................................................... 7

*Smith v. Nat'l Archives and Records Admin.*, 415 F. Supp. 3d 85 (D.D.C. 2019) ....................... 11

*Voinche v. FBI*, 412 F. Supp. 2d 60 (D.D.C. 2006)...................................................................... 11

*Watkins Law & Advocacy, PLLC v. Dep't of Veterans Affairs*, Civ. A. No. 17-1974 (ABJ)......... 5

*Weisberg v. Dep't of Just.*, 705 F.2d 1344 (D.C. Cir. 1983) ......................................................... 8

*Wilbur v. CIA*, 355 F.3d 675 (D.C. Cir. 2004)............................................................................... 5

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) .................................................................................. 9

**Statutes**

5 U.S.C. § 552 ................................................................................................................ 1

18 U.S.C. § 3521 ............................................................................................................. 10

50 U.S.C. § 3024(i)(1) .................................................................................................... 10

Defendant Federal Bureau of Investigation (the "Bureau" or "FBI") respectfully submits the following combined reply in support of its motion for summary judgment ("Def.'s Mot.," ECF No. 15) and opposition to Plaintiff's Cross-Motion for Summary Judgment ("Pl.'s Mot.," ECF No. 16) in this action brought under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

## INTRODUCTION

The parties' dispute distills to two issues: (1) whether the Bureau conducted an adequate search for records potentially responsive to Plaintiff's FOIA request; and (2) whether the Bureau's assertion of a *Glomar* response—premised on Exemptions 1, 3, 7(D), 7(E), and 7(F)—is proper.[1] As discussed below, the Court should find in the Bureau's favor on both questions.

First, the Bureau's declarations demonstrate that its search of the Central Records System using Plaintiff's first and last name was sufficient to identify any potentially responsive records contained therein, including electronic surveillance records catalogued in its electronic surveillance index. Moreover, Plaintiff's demand that the Bureau search other locations finds no support in the language of Plaintiff's own FOIA request, which—reasonably construed—asked the Bureau to locate records pertaining to the Bureau's alleged targeting of Plaintiff. It is undisputed that these records would be contained within the Central Records System. Second, the Bureau's reliance on a *Glomar* response with respect to unacknowledged records is amply supported by a comprehensive declaration that sets forth the logical and plausible bases for the Bureau's invocation of its response and is unrebutted by contradictory evidence or a showing of bad faith. Because this case presents no genuine issue of material fact as to the Bureau's compliance with the FOIA, *see* Pl.'s Resp. to Def.'s Stmt. of Undisputed Material Facts ("Pl.

---

[1]    Plaintiff does not challenge any of the Bureau's redactions or withholdings in its April 2023 release. *See* Pl.'s Mot. at 19–20.

Resp.") ¶¶ 2–11 (ECF No. 16-4); *see also* Def.'s Resp. to Pl.'s Stmt. of Add'l Facts ("Def. Resp.") ¶¶ 12–15, the Court should grant the Bureau's motion for summary judgment and deny Plaintiff's cross-motion in its entirety.

## ARGUMENT

## I.    <u>The Bureau Conducted an Adequate Search for Potentially Responsive Records</u>

### A.    **The Bureau's Search Terms Were Reasonably Calculated to Identify All Potentially Responsive Records.**

The Court should reject Plaintiff's assertion that the Bureau failed to conduct an adequate search because it did not include Plaintiff's middle name ("Christian") or middle initial ("C") in its search parameters. "In general, a FOIA petitioner cannot dictate the search terms for his or her FOIA request." *Bigwood v. Dep't of Def.*, 132 F. Supp. 3d 124, 140 (D.D.C. 2015). The agency retains "discretion in crafting a list of search terms that they believe[ ] to be reasonably tailored to uncover documents responsive to the FOIA request." *Agility Pub. Warehousing Co. K.S.C. v. Nat'l Sec. Agency*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) (internal quotation marks omitted). "Where the agency's search terms are reasonable, the Court will not [micromanage or] second guess the agency regarding whether other search terms might have been superior." *Liberation Newspaper v. Dep't of State*, 80 F. Supp. 3d 137, 146–47 (D.D.C. 2015); *see also Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("FOIA, requiring as it does both systemic and case-specific exercises of discretion and administrative judgment and expertise, is hardly an area in which the court should attempt to micromanage the executive branch."). "The plaintiff's insistence on its own preferred search terms does not undermine the reasonableness of the [FBI's] search terms." *Heffernan v. Azar*, 317 F. Supp. 3d 94, 108 (D.D.C. 2018) (citing *Agility*, 113 F. Supp. 3d at 339).

As detailed in its opening brief and the Seidel Declarations, the Bureau queried its Central Records System for the terms "John Wilson" and "Wilson, John," Plaintiff's first and last names, to locate any records potentially responsive to the FOIA request at issue. 1st Seidel Decl. ¶ 22 (ECF No. 15-2). This search reasonably could be expected "to locate responsive records because an automated search of the Sentinel indices returns multiple variations of a search term including: first and last names; first name, middle initial, and last name; and first, middle, and last names." Ex. A, Third Declaration of Michael G. Seidel ("3d Seidel Decl.") ¶ 6. Plaintiff insists that the Bureau search for variations of his name to include his middle name and middle initial, Pl.'s Mot. at 15–16; however, "a first and last name search would return all middle name variations, as well as all middle initial variations, and a [FOIA and Privacy Act] Analyst would then scope out or exclude any non-responsive middle name or middle initial variations from the results." 3d Seidel Decl. ¶ 6. The Court can therefore easily dispense with this argument.

In sum, because no genuine dispute exists regarding whether the Bureau's search of first and last names was adequate, the Court should reject Plaintiff's claim that the Bureau's search was inadequate on this ground and grant Defendant's motion for summary judgment.

**B.    The Court Should Deny Plaintiff's Demand for Searches of Other Locations.**

Plaintiff's cross-motion urges the Court to order the Bureau to search for electronic surveillance through the Electronic Surveillance (or "ELSUR") database. *See* Pl.'s Mot. at 16–17 (citing the Declaration of Jennifer Lynne Coffindaffer ("Coffindaffer Decl.") ¶ 15). The Court should not credit this assertion given the Plaintiff's apparent misunderstanding of the records indexed in the Bureau's Central Records System. The Coffindaffer Declaration contends that "[t]here are records maintained in the ELSUR files that are not maintained in the [Central Records System]." Coffindaffer Decl. ¶ 15. However, as the Bureau's declarant explains, "a separate search

of ELSUR is not necessary because the FBI's prior automated ELSUR indices interfaced with [Automated Case Support] upon its implementation in 1995." 3d Seidel Decl. ¶ 7; *see also* 1st Seidel Decl. ¶ 18 (explaining the Automated Case Support and Sentinel case management systems that facilitate searches of the Central Records System); Def. Resp. ¶ 14. Thus, "the names of targeted subjects, as well as facilities and places, surveilled since January 1, 1960, are indexed within, and searchable by, the same Sentinel search function now employed to search the [Automated Case Support] indices." 3d Seidel Decl. ¶ 7. "Although the ELSUR indices have a distinct legal identity . . . as a different Privacy Act System of Records, in terms of function, information from the ELSUR indices is indexed within the [Central Records System] and retrieved via the index search functions available in Sentinel." *Id.* Contrary to Plaintiff's claims, a search of the electronic surveillance database would yield "duplicative results" rendering such a search unnecessary. *Id.*

Plaintiff also demands that the Bureau search its Delta (confidential human source) database for records responsive to his FOIA request. But the Bureau asserts a *Glomar* response with respect to confidential human source records, as acknowledging "the existence or non-existence of responsive records in Delta . . . would disclose the identity of or endanger the life or physical safety of a confidential human source," or "cause harm to the [Bureau's] confidential human source [p]rogram." 3d Seidel Decl. ¶ 8; *see also infra* § II (addressing the sufficiency of the Bureau's *Glomar* responses).

In any event, pursuant to an order issued in a separate case involving Plaintiff in the Southern District of New York, the Bureau has already conducted a search in Delta "for variations of Plaintiff's name, his date of birth, and his email address and located no responsive records in its search of this database." *Id.*; Def. Resp. ¶ 14. "Another search of Delta would be redundant and

unlikely to result in the location of any responsive records." 3d Seidel Decl. ¶ 8. For these reasons, the Court should deny Plaintiff's request that the Court search Delta in this matter.

### C.    Plaintiff's Reliance on a Bureau Declaration in a Different Case Is Inapposite.

Plaintiff next contends that the Bureau's search was inadequate because the Bureau's search of the Central Records System would not identify all potentially responsive documents. Pl.'s Mot. at 17–18. The "adequacy of an agency's search is measured by a standard of reasonableness[] and is dependent upon the circumstances of the case." *Davis v. Dep't of Just.*, 460 F.3d 92, 105 (D.C. Cir. 2006) (quoting *Schrecker v. Dep't of Just.*, 349 F.3d 567, 662 (D.C. Cir. 2003)). "There is no requirement that an agency search every record system, but the agency must conduct a good faith, reasonable search of those systems of records likely to possess the requested records." *Jud. Watch, Inc. v. Dep't of State*, 177 F. Supp. 3d 450, 455 (D.D.C. 2016). "Agencies . . . need not expand their searches beyond the four corners of the request, nor are they required to divine a requester's intent." *Am. Chem. Council, Inc. v. Dep't of Health & Hum. Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013) (quotation marks and citation omitted). "[M]ere speculation that as yet uncovered documents might exist[] does not undermine the determination that the agency conducted an adequate search for the requested records." *Wilbur v. CIA*, 355 F.3d 675, 678 (D.C. Cir. 2004); *see also Jud. Watch,* 177 F. Supp. 3d at 455 ("The question is not whether other responsive records may exist, but whether the search itself was adequate.").

Plaintiff relies on an excerpt from a declaration filed by the Bureau in *Watkins Law & Advocacy, PLLC v. Department of Veterans Affairs*, Civ. A. No. 17-1974 (ABJ) (D.D.C.), a separate matter previously before this Court. In *Watkins*, the Bureau's declarant stated that a search of the Central Records System was not likely to uncover all potentially responsive records. *See* Pl.'s Mot. at 18. To be sure: taken out of context, this excerpt from a twenty-three-page declaration

in an unrelated matter might suggest that a search of the Central Records System here is insufficient to locate all records potentially responsive to Plaintiff's request. Not so, as a closer examination of the request and declaration in *Watkins* demonstrates why the declaration in that case has no bearing on the outcome here.

The declaration in *Watkins* described the Bureau's search for records responsive to a FOIA request that expressly sought "memorand[a] of understanding" and other records pertaining to the manner in which the Bureau and the Department of Veterans Affairs ("VA") share information on individuals who are prohibited from purchasing a firearm due to mental health conditions. *See* Ex. B, Declaration of David M. Hardy ¶ 5, *Watkins*, ECF No. 20-5 (Dec. 10, 2018) ("*Watkins* Hardy Decl."). The request in *Watkins* specifically stated that it did not seek the disclosure of any personal identifying information for the individuals provided by the VA to the Bureau. *Id.* Given the request's language, the Bureau determined that because the request was targeted at records of the Bureau's and VA's information-sharing processes "not specifically tied to an FBI investigation . . . a search of the [Central Records System was] not likely to identify all the responsive records." *Id.* ¶ 31.

Plaintiff's request here is distinguishable from *Watkins*. Plaintiff's request begins by identifying himself as its subject, then sets forth several categories of records sought, all of which—reasonably construed—pertain to investigatory records maintained by the Bureau regarding Plaintiff, including for example: "FBI informant or FBI agent contacts with" Plaintiff; "FBI contractors or others operating on behalf of the FBI or other DOJ element, contacts with" Plaintiff; "records describing or documenting interactions between [Plaintiff]" and individuals Plaintiff suspected were Bureau informants or agents; records of wiretaps or surveillance applications for Plaintiff's telephones, and the like. *See* 1st Seidel Decl., Ex. A (ECF No. 15-3 at

3). In stark contrast, the request in *Watkins* did not seek information pertaining to a specific individual or investigation, but rather "memorand[a]" and other records pertaining to the process by which the Bureau and VA share information about individuals barred from purchasing firearms. *See* Ex. B, *Watkins* Hardy Decl. ¶ 5; *see also id.* ¶¶ 20–22, 31, 37 (explaining the Bureau's reasoning for conducting a search outside the Central Records System in *Watkins*).

In this case, when presented with Plaintiff's request that, on its face, sought records of Bureau activities involving himself, the Bureau reasonably concluded that all such records would reasonably be indexed in the Central Records System, which is a comprehensive system organizing records across the entire Bureau's investigative, intelligence, applicant, personnel, and administrative functions. Seidel Decl. ¶¶ 14–15. Using Plaintiff's first and last name to query the Central Records System, the FBI located potentially responsive records, which were reviewed for responsiveness by an analyst prior to the release of non-exempt material. *See id.* ¶¶ 20–22. The Bureau also contacted personnel in its Atlanta Field Office for assistance locating a file that was ultimately deemed non-responsive. *Id.* at 11 n.9.

The Bureau's declaration is accorded a presumption of good faith. *SafeCard Servs. Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991), rebuttable only by a record that "raises substantial doubt as to the reasonableness of the search . . . in light of . . . positive indications of overlooked materials." *Jud. Watch*, 177 F. Supp. 3d at 455. Unlike *Watkins*, where the request sought "memorand[a], policies, and other communication-related documents" that the Bureau concluded—given the subject matter of the request—would be maintained outside the Central Records System, *see* Ex. B, *Watkins* Hardy Decl. ¶¶ 31, 37, here, Plaintiff did not provide "information for the [Bureau] to reasonably conclude that records responsive under the FOIA would reside outside the Central Records System", *id.* ¶ 23. The Court should therefore find that

the Bureau's search for potentially responsive records using its Central Records System was adequate here.

Plaintiff's reliance on the court's opinion granting reconsideration in *Cato Institute v. FBI*, Civ. A. No. 20-3338 (JEB) (D.D.C.), is similarly unavailing. *See* Pl.'s Mot. at 18. There, the plaintiff's request sought records about itself including any "letterhead memoranda" containing plaintiff's name. *See Cato Inst.*, Compl. Ex. 1, ECF No. 1-1. Concluding that the Hardy Declaration submitted in *Watkins* would have changed the court's prior grant of summary judgment in the Bureau's favor in *Cato Institute*, the court stated that the Hardy Declaration "raise[d] significant questions about whether a [Central Records System] search would have located 'any records regarding the Cato Institute' as requested, particularly because Cato explicitly asked for responsive 'memoranda.'" *Cato Inst.*, Jan. 9, 2024 (ECF No. 45). No such questions are presented by Plaintiff's request here, which, reasonably construed, targets records regarding the Bureau's investigative activities that are catalogued in the Central Records System, and which does not identify any categories of records, such as letterhead memoranda or the like, that may be located outside the Bureau's Central Records System.

In sum, the Bureau conducted an adequate search for records that was reasonably calculated to uncover all relevant documents. *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). Summary judgment in the Bureau's favor is therefore warranted.

## II.    The Bureau's *Glomar* Responses Are Appropriate and Should Be Upheld

### A.    The Bureau's Glomar Responses Are Not a Shield to Avoid Producing Records.

Plaintiff challenges the Bureau's use of standard *Glomar* language in this matter, asserting that the Bureau "used the [*Glomar*] responses in a general and overarching way to excuse them from providing records that are responsive to the Plaintiff's FOIA request." Pl.'s Mot. at 23

(quoting Coffindaffer Decl. ¶ 16). To the contrary: the Bureau has invoked standard *Glomar* responses that, by definition, do not acknowledge the existence or non-existence of any responsive records because "to answer the FOIA inquiry would cause harm cognizable under" the FOIA exemptions relied upon by the Bureau. *See Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007); *see generally* 2d Seidel Decl. ¶ 6. And this court has previously recognized the risk of "differential treatment" of FOIA requests such as Plaintiff's: "Were the [Bureau] to abandon its even-handed *Glomar* response, more information would land in the public domain from which individuals could inductively piece together what types of activities or behaviors may or may not attract the watchful eye of the federal government." *Kalu v. IRS*, 159 F. Supp. 3d 16, 23 (D.D.C. 2016). Mindful of that risk, the Court should affirm the Bureau's invocation of a *Glomar* response in this case.

Plaintiff does not expressly claim that the Bureau has officially acknowledged the existence of responsive documents thus precluding its reliance on a *Glomar* response, *see Jud. Watch, Inc. v. Dep't of Just.*, No. 22-5209, 2023 WL 4397354, at *2 (D.C. Cir. July 7, 2023), and the Coffindaffer Declaration's oblique suggestion of the existence of such records is insufficient to establish an official acknowledgment of any records' existence, *see* Coffindaffer Decl. ¶ 16 (stating, without specific support, that the Bureau "seem[s] to have . . . abandoned" its *Glomar* response when it "provided some documents" to Plaintiff); *see also Jud. Watch*, 2023 WL 4397354, at *2 (the plaintiff bears the "burden of pointing to specific information [disclosed] in the public domain," and the plaintiff must show that when he requested this information through a FOIA request, the agency withheld it" (quoting *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013)). Here, Plaintiff has not borne his burden of establishing that the information previously withheld under *Glomar* has been released or disclosed in the public domain. Accordingly, the

Court should deny Plaintiff's cross-motion for summary judgment with respect to the Bureau's invocation of its *Glomar* response.

### B.   The Bureau's Declaration Sufficiently Justifies the Agency's *Glomar* Response.

Plaintiff relies largely on unsupported assertions contained in the Coffindaffer Declaration to challenge the Bureau's *Glomar* responses. *See* Pl.'s Mot. at 23–29. As a threshold matter, the Coffindaffer Declaration contains legal conclusions regarding the Bureau's *Glomar* response that are not statements of fact. *See, e.g.*, Coffindaffer Decl. ¶ 18 (asserting that "there are no national security issues presented, nor are there any Watch List concerns"); *see also Lee v. Geren*, 480 F. Supp. 2d 198, 207 (D.D.C. 2007) (discounting plaintiff's legal conclusions presented as statements of fact). Nor should the statements contained in the Coffindaffer Declaration be taken to reflect the Bureau's official views or policies. *See* 3d Seidel Decl. ¶ 5.

In any event, Plaintiff's arguments miss the mark. "In *Glomar* cases, courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). Here, the Bureau has provided a detailed declaration explaining each of its *Glomar* responses on Exemptions 1, 3, 7(D), 7(E), and 7(F), to neither confirm nor deny the existence of records in four categories: national security or foreign intelligence records pursuant to FOIA Exemption 1 and Exemption 3, in conjunction with 50 U.S.C. § 3024(i)(1); records that would identify any individual in the Witness Security Program pursuant to FOIA Exemption 3 and 18 U.S.C. § 3521; records that would identify any individual on a watchlist pursuant to FOIA Exemption 7(E); and records, the release of which could reasonably be expected to endanger the life or physical safety of a confidential human source pursuant to FOIA Exemption 7(D), 7(E), and

7(F).   2d Seidel Decl. ¶¶ 7–33; *see also* Def.'s Mot. at 18–24 (discussing each exemption's application to the Bureau's *Glomar* response). The comprehensive declaration submitted as support for the Bureau's *Glomar* responses here provides the "logical or plausible" bases for invoking each FOIA exemption. *See, e.g.*, *Smith v. Nat'l Archives & Records Admin.*, 415 F. Supp. 3d 85, 94 (D.D.C. 2019) (finding the level of detail provided in the agency's declaration sufficient "to support a *Glomar* response").

"The presumption of good faith accorded to agency affidavits "cannot be rebutted 'purely by speculative claims about the existence and discoverability of other documents." *Smith*, 415 F. Supp. 3d at 94 (quoting *SafeCard*, 926 F. 2d 1197, 1200); *see Voinche v. FBI*, 412 F. Supp. 2d 60, 72 (D.D.C. 2006) (awarding summary judgment to the Bureau where plaintiff "presented no actual evidence refuting any statements made by the FBI, but rather mere assertions that the FBI may possess additional information in addition to that already disclosed"). Here, Plaintiff's assertions rise no further than the level of speculation that other records must exist. *See* 2d Declaration of John Christian Wilson ("Wilson Decl.") ¶¶ 46–53 (ECF No. 17-2) (Plaintiff asserts, based on his belief that the Bureau "targeted" him for his prior work as an energy analyst, that the Bureau has acted in bad faith by failing to produce records that would confirm his beliefs); Coffindaffer Decl. ¶¶ 17–21 (arguing, without actual evidence, that the Bureau is using its *Glomar* response as an "excuse" to keep records "hidden"). Where "the [agency's] declarations sufficiently demonstrate the adequacy of defendants' search and the propriety of their decision to withhold certain material pursuant to specified exemptions," a plaintiff's "conclusory, self-serving . . . declaration . . . is woefully inadequate to create a genuine dispute of fact[.]" *Freedom Watch, Inc. v. NSA*, 197 F. Supp. 3d 165, 176 (D.D.C. 2016). The Court should therefore uphold the Bureau's *Glomar* response and deny Plaintiff's cross-motion for summary judgment.

**CONCLUSION**

For the reasons stated above, the Bureau respectfully requests that the Court grant summary

judgment in its favor and deny Plaintiff's cross-motion for summary judgment.

Dated: April 26, 2024                          Respectfully submitted,
      Washington, DC

MATTHEW M. GRAVES, D.C. Bar #481052
United States Attorney

BRIAN P. HUDAK
Chief, Civil Division


By: _____/s/ Tabitha Bartholomew_____
    TABITHA BARTHOLOMEW
    D.C. Bar No. 1044448
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 252-2529
    Tabitha.Bartholomew@usdoj.gov

*Attorneys for the United States of America*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN CHRISTIAN WILSON,

        Plaintiff,

        v.

FEDERAL BUREAU OF INVESTIGATION,

        Defendant.

Civil Action No. 22-3062 (ABJ)

## **[PROPOSED] ORDER**

UPON CONSIDERATION of Defendant's Motion for Summary Judgment, Plaintiff's Cross-Motion for Summary Judgment, the parties' submissions, and the entire record herein, it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED; and it is further

ORDERED that Plaintiff's Cross-Motion for Summary Judgment is DENIED.

SO ORDERED.

Dated: _____           _____

                                           Amy Berman Jackson

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN CHRISTIAN WILSON,

    Plaintiff,

       v.

FEDERAL BUREAU OF INVESTIGATION,

    Defendant.

Civil Action No. 22-cv-3062 (ABJ)

## THIRD DECLARATION OF MICHAEL G. SEIDEL

I, Michael G. Seidel, declare as follows:

1.    I am the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division (IMD), Federal Bureau of Investigation (FBI), Winchester, Virginia. I joined the FBI in September 2011, and prior to my current position, I was the Assistant Section Chief of RIDS from June 2016 to July 2020; Unit Chief, RIDS Litigation Support Unit, from November 2012 to June 2016; and an Assistant General Counsel, FBI Office of the General Counsel, Freedom of Information Act (FOIA) Litigation Unit, from September 2011 to November 2012. In those capacities, I had management oversight or agency counsel responsibility for FBI FOIA and Privacy Act (FOIPA) litigation cases nationwide. Prior to joining the FBI, I served as a Senior Attorney, U.S. Drug Enforcement Administration (DEA), from September 2006 to September 2011, where among myriad legal responsibilities, I advised on FOIPA matters and served as agency counsel representing the DEA in FOIPA suits nationwide. I also served as a U.S. Army Judge Advocate General's Corps Officer in various

1

assignments from 1994 to September 2006 culminating in my assignment as Chief, General

Litigation Branch, U.S. Army Litigation Division, where I oversaw FOIPA litigation for the U.S.

Army. I am an attorney licensed in the State of Ohio and the District of Columbia.

2.      In my official capacity as Section Chief of RIDS, I supervise approximately 235

FBI employees, supported by approximately 109 contractors, who staff a total of nine (9) Federal

Bureau of Investigation Headquarters (FBIHQ) units and two (2) field operational service center

units whose collective mission is to effectively plan, develop, direct, and manage responses to

requests for access to FBI records and information pursuant to the FOIA as amended by the

OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act

of 2016; the Privacy Act of 1974; Executive Order 13526; Presidential, Attorney General, and

FBI policies and procedures; judicial decisions; and Presidential and Congressional directives.

The statements contained in this declaration are based upon my personal knowledge, upon

information provided to me in my official capacity, and upon conclusions and determinations

reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures

followed by the FBI in responding to requests for information from its files pursuant to the

provisions of the FOIA, 5 U.S.C. § 552 and the Privacy Act of 1974, 5 U.S.C. § 552a.

Specifically, I am aware of the FBI's handling of Plaintiff's Freedom of Information/Privacy Act

(FOIPA) request that is the subject of this litigation.

4.      The FBI submits this declaration in response to Plaintiff's Opposition to

Defendant's Motion for Summary Judgment and Plaintiff's Cross-Motion for Summary

Judgment dated March 21, 2024 (ECF Nos. 16 and 17) and supplements and incorporates by

reference the information provided in the FBI's first and second declarations filed in this matter

on February 22, 2024 (ECF No. 15-2 and 15-4) (hereinafter "First Seidel Declaration" and

"Second Seidel Declaration," respectively).[1] This declaration provides the Court with the

procedures used to search for responsive records to Plaintiff's FOIPA request pursuant to the

FOIA.

## ADEQUACY OF SEARCH
### Coffindaffer Declaration Is Not An Official FBI Acknowledgment

5.      Plaintiff's Opposition includes a declaration of an individual who declares she is a

former FBI employee. This individual is not a current FBI employee, nor does she speak for the

FBI. Any assertions contained in that declaration should not be construed as the official views or

policies of the FBI. The FBI's media policy lists the individuals that are permitted to speak on

behalf of the FBI, and those individuals are the FBI Director, Deputy Director, Associate Deputy

Director, Assistant Director of the Office of Public Affairs, and the head of each field office. *See*

---

[1] The First Seidel Declaration provides the Court with a summary of the administrative history of Plaintiff's request; describes the procedures used to search for, review, and process responsive records; in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) explains the FBI's justification for withholding information in part or in full pursuant to Privacy Act Exemption (k)(2), 5 U.S.C. § 552a (k)(2) and FOIA Exemptions 6, 7(C), and 7(E), 5 U.S.C §§ 552 (k)(6), (b)(7)(C), and (b)(7)(E); and provides the FBI's justification for neither confirming nor denying the existence of certain types of records pursuant to FOIA Exemption 1, 3, 7(E), 7(F), and/or Privacy Act Exemption (j)(2), 5 U.S.C. § 552(b)(1), (b)(3), (b)(7)(E), and (b)(7)(F). The Second Seidel Declaration provides the Court with justification for the FBI's standard position to neither confirm nor deny the existence of unacknowledged records within the following categories: national security of foreign intelligence records pursuant to FOIA Exemption 1 and Exemption 3, in conjunction with 50 U.S.C. § 3024(i)(1); records that would identify any individual in the Witness Security Program pursuant to FOIA Exemption 3 and 18 U.S.C. § 3521; records that would identify any individual on a watchlist pursuant to FOIA Exemption 7(E); and records, the release of which could reasonably be expected to endanger the life or physical safety of a confidential human source (CHS) pursuant to FOIA Exemption 7(D), 7(E), and 7(F).

*Public Affairs Policy Guide: Media Relations, External Communications, and Personal Use of Social Media, 1002PG (dated November 14, 2017), p. 15 (Section 4.1.1).*[2]

THE FBI'S SEARCH FOR RECORDS ON PLAINTIFF INCLUDED VARIATIONS OF PLAINTIFF'S NAME

6.      In response to Plaintiff's request, the FBI conducted a CRS index search for potentially responsive records using the indices search terms "John Wilson" and "Wilson, John." This search was reasonably calculated to locate responsive records because an automated search of the Sentinel indices returns multiple variations of a search term including: first and last names; first name, middle initial, and last name; and first, middle, and last names. Thus, a search using the term "John Wilson" or "Wilson, John" would potentially yield more results than a search using more narrow variations such as "John Christian Wilson" or "John C. Wilson." In fact, a first and last name search would return all middle name variations, as well as all middle initial variations, and a FOIPA Analyst would then scope out or exclude any non-responsive middle name or middle initial variations from the results. Therefore, the FBI's standard search approach excludes middle initial searching, as middle initials and middle names are automatically returned in first and last name searching.

PLAINTIFF'S REQUEST FOR ELECTRONIC SURVEILLANCE (ELSUR) SEARCH

7.      Plaintiff claims that the FBI did not search its ELSUR indices for responsive records. However, a separate search of ELSUR is not necessary because the FBI's prior automated ELSUR indices interfaced with ACS upon its implementation in 1995. As a result, the names of targeted subjects, as well as facilities and places, surveilled since January 1, 1960, are

---

[2] Available at https://vault.fbi.gov/public-affairs-policy-guide-media-relations-external-communications-and-personal-use-of-social-media-1002pg/public-affairs-policy-guide-media-relations-external-communications-and-personal-use-of-social-media-1002pg-part-01-of-01/view (last accessed April 19, 2024).

indexed within, and searchable by, the same Sentinel search function now employed to search

the ACS indices. Although the ELSUR indices have a distinct legal identity from the CRS as a

different Privacy Act System of Records, in terms of function, information from the ELSUR

indices is indexed within the CRS and retrieved via the index search functions available in

Sentinel. Accordingly, a search of the ELSUR indices would provide duplicative results to the

CRS index search results, and a separate search of the ELSUR indices is not necessary.

PLAINTIFF'S REQUEST FOR DELTA SEARCH

8.    Plaintiff claims that the FBI did not search for records in its Delta database. Delta

is an electronic human source database that provides a uniform mechanism for Confidential

Human Source administration, reduces human error and paperwork, and addresses all aspects of

compliance, such as Attorney General Guidelines and FBI policies. Through Delta, the FBI

manages, tasks, cross-utilizes, and addresses national intelligence priorities while protecting its

human sources. To the extent Plaintiff requests a search of Delta, which houses FBI informant

records, the FBI can neither confirm nor deny the existence or non-existence of responsive

records in Delta because to do so would disclose the identity of or endanger the life or physical

safety of a CHS and cause harm to the FBI's CHS Program because the Delta database contains

identifying information of CHSs, information concerning the administration of and compliance

of CHSs, and contains information provided by CHSs.  The very existence or non-existence of

responsive information within Delta concerning CHSs, and when located through a name search,

is exempt pursuant to FOIA Exemptions 7(D), 7(E), and (7)(F). As stated in the Second Seidel

5

Declaration at ¶ 4, the FBI must rely on a *Glomar*[3] response regardless of whether responsive

records exist (*i.e.*, including when the FBI does not possess responsive records). The harms in

revealing the existence of CHS records in response to a request for records on an individual are

further described in the Second Seidel Declaration at ¶¶ 29, 31, and 33. Accordingly, the FBI

does not search for records responsive to a FOIA request in its Delta database absent a positive

indication that such records would exist or pursuant to a court order.

9.      In a separate case, filed by the instant Plaintiff, in the Southern District of New

York, the Court did issue an order for the FBI to search Delta. (*See Wilson v. FBI, Lexis*

*CourtLink, No.* 20-cv-10324 at ECF No. 44.) In response to that Order, the FBI searched Delta

for variations of Plaintiff's name, his date of birth, and his email address and located no

responsive records in its search of this database. Another search of Delta would be redundant and

unlikely to result in the location of any responsive records.[4]

## CONCLUSION

10.     The FBI performed adequate and reasonable searches for responsive records

subject to the FOIA and searched all locations and files reasonably likely to have responsive

records. Plaintiff provided no information to indicate that responsive records reside outside of the

CRS.

_____

[3] As stated in the Second Seidel Declaration at ¶ 4, the term "*Glomar*" refers to the subject of a
FOIA request submitted to the CIA. The requester sought information concerning a ship named
the *Glomar Explorer* and the CIA refused to confirm or deny its knowledge of the *Glomar*
vessel, because to do so would compromise the national security or divulge intelligence sources
and methods. *Phillippi v. CIA*, 655 F.2d 1325 (D.C. Cir. 1981).
[4] To the extent that Plaintiff is requesting a search of third-party names in Delta, Plaintiff has not
provided a privacy waiver, proof of death, nor has he articulated a significant public interest that
would outweigh the alleged individuals' privacy interests.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Executed this _____23rd_____ day of April 2024.

MICHAEL G. SEIDEL
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

7

EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WATKINS LAW & ADVOCACY, PLLC

Plaintiff,

v.

DEPARTMENT OF VETERANS AFFAIRS, et al.,

Defendants.

Civ. A. No. 1:17-cv-01974-ABJ

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"),[1] at the Federal Bureau of Investigation in Winchester, Virginia.  I have held this position since August 1, 2002.  Prior to joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)      In my official capacity as Section Chief of RIDS, I supervise approximately 237 employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters "FBIHQ") units and two (2) field operational service center units whose collective mission is to

---

[1] In May 2018, the FBI changed the name of its Records Management Division ("RMD") to IMD.

1

effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; the FOIA Improvement Act of 2016; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and other Presidential and Congressional directives.  The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)     Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiff's request for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552.  Specifically, I am familiar with the FBI's handling of the Freedom of Information Act ("FOIA") request submitted by Plaintiff for records provided by the Department of Veterans Affairs ("VA") to the FBI concerning Memorandums of Understanding ("MOUs"), the National Instant Criminal Background Check System ("NICS"), and any records memorializing FBI custody or control of such records all communications made by or on behalf of the United States Attorney General to the VA.  Additionally, I am familiar with the FBI's handling of a FOIA consultation sent to the FBI by DOJ, Office of Information Policy ("OIP") concerning a DOJ document located by VA during the processing of Plaintiff's request submitted to VA.

(4)     The purpose of this declaration is to provide the Court and Plaintiff with an explanation of the FBI's handling of Plaintiff's FOIA request.  Additionally, this Declaration is in support of Defendant's Motion for Summary Judgment as the FBI has responded to each part of Plaintiff's FOIA request separately, rendering his complaint moot.

2

## ADMINISTRATIVE HISTORY OF PLAINTIFF'S FOIA REQUEST

(5)     By email dated October 21, 2015, Plaintiff submitted a FOIA request to the FBI

seeking:

a. each Memorandum of Understanding entered into between the United States
   Department of Veterans Affairs ("VA") and the United States Department of Justice
   ("DOJ"), Federal Bureau of Investigation ("FBI"), concerning or relating to
   submission by the VA to the DOJ/FBI of information on persons to be prohibited
   from purchasing a firearm, including but not limited to: the Memorandum of
   Understanding Between the United States Department of Veterans Affairs and the
   Federal Bureau of Investigation Regarding the National Instant Criminal Background
   Check System, dated February 27, 2012 (including all amendments, supplements,
   exhibits, and addenda thereto);

b. all records (including all amendments, supplements, exhibits, and addenda thereto)
   which set out or reflect the providing of information (such as names of individuals)
   by the VA to the DOJ/FBI for inclusion in the National Instant Criminal Background
   Check System ("NICS"), including but not limited to the NICS Index Mental
   Defective Commitment File, including but not limited to any directive, guidance,
   policy, instruction, manual, procedure, guideline, standard, internal advice, message,
   checklist, flow chart, and/or memorandum with respect thereto;

c. to the extent the FBI itself has custody or control of such records, all communications
   made by or on behalf of the United States Attorney General ("OAG") to the VA
   requesting or requiring that the VA submit to the DOJ/FBI information on persons to
   be prohibited from purchasing a firearm, and all communications from the VA in
   response thereto (on information and belief, OAG made such a request to the VA in
   1998) (this request does not seek the subsequent communications that actually
   provide information concerning particular individuals).

(*See* **Exhibit A**.)  The FOIA request specifically stated that "none of the aforementioned requests

seek disclosure of the names of individuals provided by the VA to the FBI, nor do they seek any

information protected under the Privacy Act."

(6)     For administrative convenience, the FBI separated this FOIA request into three

separate cases in its FOIPA Document Processing System ("FDPS")[2] and will address its responses to each part *infra*.

### FOIPA Request Number 1338932-000 (Item "A")

(7)     By letter dated November 17, 2015, the FBI acknowledged receipt of Plaintiff's request[3] and assigned it FOIPA Request Number 1338932-000.  The FBI advised that it was searching the indices to the Central Records System for information responsive to his request.[4] (*See* **Exhibit B.)**

(8)     By letter dated January 20, 2016, the FBI advised Plaintiff it reviewed 12 pages of responsive material and determined this material originated with, or contained information concerning, other Government Agency(ies) [OGA].[5]  The FBI administratively closed the request pending the completion of the consultation.  (*See* **Exhibit C.)**  This request was then re-opened after the consultation was completed as FOIPA Request Number 1338932-001.

### FOIPA Request Number 1338932-001

(9)     On May 11, 2016, the VA advised the FBI to release the 12 pages of responsive material that the FBI had identified in response to Item A of the request in full to Plaintiff. Therefore, the FBI reopened this part of Plaintiff's FOIA request and assigned it FOIPA Request Number 1338932-001.

---

[2] FDPS is the internal repository and application utilized by RIDS to process, track, and respond to FOIA and or Privacy Act ("FOIPA") requests received by FBI.  It stores FOIPA related records.

[3] *See* ¶ 5a, *supra,* herein referred to as "item A."
[4] The FBI understood Plaintiff's request as seeking only the Memoranda of Understanding (MOU) described in ¶ 5a, *supra*. Plaintiff's request did not seek, for example, ancillary documents related to the creation of the MOU.
[5] The FBI consulted with the VA for this part of the request.

(10)     By letter dated June 23, 2016, the FBI advised that its consultation was complete

and released 12 pages of responsive material to Plaintiff in full.  **(***See* **Exhibit D**.)  The 12 pages

consisted of the February 27, 2012 MOU that was identified in Item A of the FOIA request, and

included any amendments, exhibits, or attachments to the MOU.   The FBI did not locate any

other MOU between the FBI and the VA concerning or relating to submission by the VA to the

DOJ/FBI of information on persons to be prohibited from purchasing a firearm.

### *FOIPA Request Number 1338949-000 (Item "B")*

(11)     By letter dated November 5, 2015, the FBI acknowledged receipt of Plaintiff's

request[6] and assigned it FOIPA Request Number 1338949-000.

(12)     In light of the express language in the request excluding the names of individuals

(and other Privacy Act protected material) from the scope of the request, the FBI understood this

part of the request to seek documents regarding the process by which the VA provided names (or

other information) to the FBI for inclusion in the National Instant Criminal Background Check

System ("NICS").  That process is described in the MOU that the FBI produced in response to

Item A of the request. The FBI advised Plaintiff that it located 59 pages of responsive records

previously processed under the FOIA, but it was withholding the material in full pursuant to

FOIA Exemption (b)(7)(E).  **(***See* **Exhibit E.)**  As discussed in paragraph 41 *infra*, the FBI

ultimately determined that these 59 pages were not responsive to the request.

(13)     The NICS Index Mental Commitment File[7], which also is referenced in the

---

[6] *See* ¶ 5b, *supra*, herein referred to as "item B."

[7] When a record of a person prohibited from possessing a firearm as a result of mental health
issues (i.e., a person who has been involuntarily committed to a mental institution or adjudicated
a "mental defective" by a court, board, or other lawful authority) is entered in the NICS Indices,
the entry contains only a name, other biographic identifiers (e.g., date of birth), and codes for the
submitting entity and prohibited category. For further information, see:
https://www.bjs.gov/index.cfm?ty=tp&tid=49#terms

request, is itself a listing of names and biographic identifiers of individuals who are prohibited from possessing a firearm as a result of mental health issues.[8] Accordingly, the FBI determined that file to be outside the scope of Plaintiff's request because the request specifically stated that it was not seeking the production of names of individuals provided by the VA to the FBI or other Privacy Act protected information. Ultimately, the FBI found no records responsive to item B, beyond the MOU itself that was released in response to item A of the request. The process by which the VA provides names (or other information) to the FBI for inclusion in NICS is described in the MOU that the FBI produced in response to the first part (item A) of the request. As set forth in the MOU, at the time of the MOU, the process was for the VA to provide encrypted compact discs with the data addressed in the MOU not less than on a quarterly basis.[9] Starting in June 2016, after the search cut-off date of November 3, 2015, associated with Plaintiff's FOIA request, the VA began electronically transmitting the information to the FBI for inclusion in NICS as described in the MOU. As discussed in paragraph 39 *infra*, the FBI conducted a search for any cover letters or similar documentation which may have accompanied the encrypted compact discs and was unable to locate any documents. As part of its search for responsive documents further discussed *infra*, RIDS contacted the individual at the FBI's Criminal Justice Information Services ("CJIS") who received the compact discs from the VA pursuant to the MOU and that individual confirmed that there was no official correspondence that the VA provided with the transmittal of the compact discs.

(14)    By letter dated November 16, 2015, Plaintiff submitted an appeal to DOJ OIP

---

[8] 18 USC § 922(g)(4) prohibits the receipt or possession of firearms by an individual who has been "adjudicated as a mental defective" or "committed to a mental institution."

[9] *See* Memorandum of Understanding Between the United States Department of Veterans Affairs and the Federal Bureau of Investigation Regarding the National Instant Criminal Background Check System dated February 27, 2012, Sections I and V(B)(6).

contesting the FBI's November 5, 2015, response to his FOIA request number 1338949-000.
(*See* **Exhibit F.)**

(15)   By letter dated November 18, 2015, OIP acknowledged receipt of Plaintiff's
appeal and assigned it appeal number AP-2016-00612. (*See* **Exhibit G.)**

(16)   By letter dated March 16, 2016, OIP affirmed the FBI's response stating it
properly withheld the requested information in full under FOIA Exemption (b)(7)(E).  OIP also
advised Plaintiff of his right to mediation services through the Office of Government Information
Services (OGIS).  (*See* **Exhibit H.)**

***FOIPA Request Number 1338965-000 (Item "C")***

(17)   By letter dated November 10, 2015, the FBI acknowledged receipt of Plaintiff's
request[10] and assigned it FOIPA Request Number 1338965-000.  The FBI advised that it was
searching the indices to the Central Records System for information responsive to his request.
(*See* **Exhibit I.)**

(18)   By letter dated November 25, 2015, the FBI advised Plaintiff it conducted a
search of the FBI's Central Records System and was unable to locate any main file records
responsive to his request.  Additionally, the FBI advised Plaintiff if he had additional information
to provide, the FBI would conduct an additional search.  Finally, the FBI advised Plaintiff of his
right to file an appeal with OIP within sixty (60) days from the date of the letter in order to be
considered timely.  (***See*** **Exhibit J.)**

(19)   On September 25, 2017, Plaintiff filed his complaint in the instant action.  (*See*
**Docket Number 1.)**

---

[10] *See* ¶ 5c, *supra*, herein referred to as "item C."

7

## BACKGROUND ON THE NICS[11]

(20)      The NICS is a national system that checks available records on persons who may

be disqualified from receiving firearms.  Specifically, it is a computerized background check

system designed to respond instantly on most background check inquiries, which allows the

Federal Firearm Licensees ("FFLs") to receive an almost immediate response for information on

either: if a prospective buyer is eligible to buy firearms (e.g. ensuring the customer does not have

a criminal record or is not otherwise ineligible to make such a purchase) or if the transfer of a

firearm would be in violation of Section 922 (g) or (n) of Title 18, United States Code, or state

law.  As described in paragraph 13 and fn 9 *supra*, the MOU between the FBI and the VA

requested in item A of the FOIA request sets forth a procedure for the VA to provide names and

other Privacy Act protected information of individuals who have certain mental health issues to

be included in the NICS.  In addition to names of individuals, the information provided pursuant

to the MOU includes other Privacy Act protected information, such as date of birth, social

security number, sex, race, place of birth, height, weight, and category of prohibited or restricted

person under 18 U.S.C. § 922.[12]

(21)      The NICS Index Mental Commitment File, further described in paragraph 13

*supra,* and which also is referenced in item B of the FOIA request, is a listing of names and

biographic identifiers of individuals who are prohibited from possessing a firearm as a result of

mental health issues and includes individuals provided by the VA to the FBI under the MOU.

(22)      NICS is located at the FBI's CJIS Division in Clarksburg, West Virginia and

---

[11] For further information, see https://www.fbi.gov/services/cjis/nics.

[12] *See* Memorandum of Understanding Between the United States Department of Veterans
Affairs and the Federal Bureau of Investigation Regarding the National Instant Criminal
Background Check System dated February 27, 2012, Sections V(A)(1-7).

provides full service to FFLs in 30 states, five U.S. territories, and the District of Columbia.
Therefore, records related to the NICS are most likely located within CJIS Division.

## **BACKGROUND ON THE FBI'S SEARCH FOR RECORDS**

### ***The FBI'S Central Records System***

(23)     The Central Records System ("CRS") is an extensive system of records consisting
of applicant, investigative, intelligence, personnel, administrative, and general files compiled and
maintained by the FBI in the course of fulfilling its integrated missions and functions as a law
enforcement, counterterrorism, and intelligence agency to include performance of administrative
and personnel functions.  The CRS spans the entire FBI organization and encompasses the
records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices
("Legats") worldwide.

(24)     The CRS consists of a numerical sequence of files, called FBI "classifications,"
which are organized according to designated subject categories.  The broad array of CRS file
classification categories include types of criminal conduct and investigations conducted by the
FBI, as well as categorical subjects pertaining to counterterrorism, intelligence,
counterintelligence, personnel, and administrative matters.  For identification and retrieval
purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number
("UCFN") consisting of three sequential components:  (a) the CRS file classification number, (b)
the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned
individual case file number for that particular subject matter.[13]  Within each case file, pertinent

---

[13] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates
the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and
"56789"is the assigned case specific file number.

documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

### The CRS General Indices and Indexing

(25)     The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. The entries in the general indices fall into two category types:

     a.   <u>Main entry</u>. This entry pertains to records indexed to the main subject(s) of a file, known as "main file" records. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

     b.   <u>Reference entry</u>. This entry, or a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter.

(26)     FBI Special Agents ("SA") and/or designated support personnel may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is based on operational necessity, and the FBI only indexes that information considered relevant and necessary for future retrieval. Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

### Automated Case Support

10

(27)    Automated Case Support ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995.  As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices.  ACS had an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[14]

(28)    The Universal Index ("UNI") was the automated index of the CRS and provided all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching.  Individual names were recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event.  Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data that was already indexed into the prior automated systems superseded by ACS.  As such, a UNI index search in ACS was capable of locating FBI records well before its 1995 FBI-wide implementation until the system was decommissioned on August 1, 2018, in both paper and electronic format.[15]

_____

[14] ACS was and the next generation Sentinel system is relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[15] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices."  A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973.  In this case, Plaintiff's search request was for records between 2008 and 2016; therefore, any responsive records would have been captured through a UNI search.

***ACS and Sentinel***

(29)    Sentinel is the FBI's next generation case management system that became
effective FBI-wide on July 1, 2012.  Sentinel provides a web-based interface to FBI users, and it
includes the same automated application that was utilized in ACS.  After July 1, 2012, all FBI
generated records are created electronically in case files via Sentinel; however, Sentinel did not
replace ACS and its relevance as an important FBI search mechanism.  Just as pertinent
information was indexed into UNI for records generated in ACS before July 1, 2012, when a
record is generated in Sentinel, information is indexed for future retrieval.  Moreover, there was
an index data sharing nexus between the Sentinel and ACS systems whereby information
indexed into Sentinel was replicated or "backfilled" into ACS.  In sum, the Sentinel case
management system built on ACS and shared its operational purpose; Sentinel provides another
portal to locate information within the vast CRS for FBI records generated on or after July 1,
2012.  The CRC automated indices, available within Sentinel and UNI application of ACS, in
most cases represented the most reasonable means for the FBI to locate potentially responsive
records to FOIPA requests prior to August 1, 2018.[16]  This is because these automated indices
offered access to a comprehensive, agency-wide set of indexed data on a wide variety of
investigative and administrative subjects.  Currently, the FBI's automated indices consist of
approximately 120 million searchable records and are updated daily with newly indexed
material.

_____

[16] On August 1, 2018, the ACS case management system was decommissioned and ACS data
was migrated into Sentinel including the ACS indices data and digitized investigative records
formerly available in ACS.  Moreover, Sentinel retains the index search methodology and
function whereby the CRS is queried via Sentinel for pertinent indexed main or reference entries
in case files.  All CRS index data from the UNI application previously searched via ACS is now
searched through the "ACS Search" function within Sentinel.

*FDPS Retrieval*

(30)    RIDS conducts a search of FDPS for any FOIA/PA requests received by the FBI via the retrieval function. A retrieval search allows RIDS employees to search FDPS by entering search criteria in search fields to retrieve a hit-list of requests.  From the hit-list, one can view all available information about a request, such as requesters' names, subject of request, date received, date closed, etc. A retrieval search of FDPS will locate any records on the same topic that had already been processed and released (*i.e.*, "pre-processed records").

## THE FBI'S SEARCH FOR RECORDS
## RESPONSIVE TO PLAINTIFF'S REQUEST

(31)    It is the FBI's practice to search the Central Records System ("CRS") to determine if the FBI has records about a particular subject in response to most FOIPA requests. However, in this particular case, Plaintiff requested memorandums, policies, and other communication-related documents not specifically tied to an FBI investigation. Therefore, a search of the CRS is not likely to identify all the responsive records.

(32)    RIDS conducted a retrieval search of FDPS for Items A, B, and C. Additionally, RIDS contacted the CJIS Division requesting it to conduct searches for information responsive to Plaintiff's FOIA request. Finally, in an abundance of caution, RIDS conducted an ACS and Sentinel search to ensure it identified all potentially responsive records.

*FDPS Retrieval Search Results for Item A*

(33)    RIDS conducted a search of FDPS for the memorandum between the VA and the FBI about the NICS, dated February 27, 2012. RIDS conducted the retrieval search of FDPS by entering "Memorandum of Understanding between FBI and Veterans Administration" in the subject field. This search found no previous FOIA requests responsive to Item A.

*FDPS Retrieval Search Results for Item B*

13

(34)     RIDS conducted a retrieval search of FDPS for policies and procedures concerning the NICS. RIDS conducted the retrieval search of FDPS by entering "National Instant Criminal Background" in the subject field. This search produced one previous FOIA request seeking general policies and procedures related to the NICS. RIDS initially identified 59 pre-processed pages of material related to NICS policies and procedures responsive to Plaintiff's request. RIDS' records library did not contain these records. RIDS contacted the CJIS Division which provided 59 pages of material related to NICS policies and procedures.

(35)     RIDS initially determined this 59 pages of material was responsive to item B of Plaintiff's FOIA request, and therefore advised Plaintiff that 59 pages were previously processed and were being withheld in full under FOIA Exemption (b)(7)(E).

### FDPS Retrieval Search Results for Item C

(36)     RIDS conducted a search of FDPS for all communications between the Attorney General and Veterans administration, concerning requirements for prohibiting persons from purchasing firearms. RIDS conducted the retrieval search of FDPS by entering "Communications between the Attorney General and Veterans Administration" in the subject field. This search found no previous FOIA requests with material responsive to Item C.

### CJIS Search for Items A, B, and C

(37)     RIDS contacted CJIS because CJIS is the FBI division most likely to possess responsive records in its internal archives.[17] In response to items A (FOIPA Request Number 1338932-000) and C (FOIPA Request Number 1338965-000), RIDS contacted the CJIS Division and requested a search of CJIS' archives for anything responsive to Plaintiff's request. CJIS located 12 pages of material responsive to item A of Plaintiff's request, but did not locate any

---

[17] *See* ¶ 22, *supra*.

14

material responsive to item C.

(38)    Following Plaintiff's filing of the instant complaint, RIDS contacted CJIS to verify the results of their original search for items A and C. Specifically, RIDS personnel identified the original author of the MOU ("the Author") and contacted the Author directly. The Author confirmed the 12 pages of records are the only records available in the CJIS archives responsive to Plaintiff's request. The Author also affirmed there is no alternative system or archive where records responsive to items A or C would be stored.

(39)    Additionally, RIDS requested CJIS search for records responsive to item B (FOIPA Request Number 1338949-000). CJIS confirmed it did not locate anything responsive to item B. Moreover, CJIS could not identify an alternative archive where records responsive to item B would be stored. RIDS specifically requested that CJIS search for cover letters or similar documentation which may have accompanied the encrypted compact discs provided from the VA to the FBI pursuant to the MOU. CJIS conducted a search and was unable to locate any documents. As part of its search for responsive documents, RIDS contacted the individual at CJIS who received the compact discs from the VA pursuant to the MOU and that individual confirmed that there was no official correspondence that the VA provided with the transmittal of the compact discs. This individual also is not aware of any directive, formal guidance, policy, or checklist governing the compact discs from the VA (other than to the extent reflected in the MOU itself).

### *Supplemental ACS and Sentinel Index Search for Items A, B, and C*

(40)    Though RIDS deemed the original retrieval searches and subsequent searches as well as the searches conducted by CJIS likely to find all responsive records, following Plaintiff's

15

filing of the instant complaint, it also conducted a "string"[18] index search of ACS and Sentinel

using the following search terms to locate records responsive to items A, B, and C of Plaintiff's

request: "Veterans Affairs Gun," "VA Gun," "Veterans Affairs," "VA," "National Instant

Criminal Background Check Veterans Affairs," "National Instant Criminal Background Check

VA," "NICS Veterans Affairs," and "NICS VA." RIDS did not locate any additional responsive

records as a result of this search.

## SUPPLEMENTAL REVIEW OF ITEM B RECORDS

(41)    Following Plaintiff's filing of the instant complaint, RIDS reviewed de novo

Plaintiff's request and the 59 pages of material originally deemed responsive to Item B. RIDS

determined it incorrectly interpreted this part of Plaintiff's request. RIDS' original interpretation

was overly broad. In an abundance of caution, RIDS examined the 59 pages closely to ensure it

did not contain any responsive material. RIDS determined all 59 pages are not responsive to

Plaintiff's specific request because the material does not "reflect the providing of information

(such as names of individuals) by the VA to the DOJ/FBI…[emphasis added]." See ¶ 5b, *supra*.

Thus, RIDS confirmed this material is not responsive. Instead the material relates to various

internal policies and procedures related generally to the FBI's use of the NICS for its own

purposes. The material is intended for use by CJIS personnel utilizing the NICS and includes

detailed descriptions of the NICS such as standard operating procedures for CJIS personnel using

the system and descriptions of the system's capabilities. The pages discuss processes generally

and do not address specifically any process for inclusion into the NICS of information provided

---

[18]    A "string search" is a search of all terms where the starting characters match the characters
typed into the name field. Such a search will automatically capture variations that include these
starting characters. A string search is designed to bring up variations of the search term as long
as the starting characters of the indexed term match the starting characters of the search term
exactly.

by the VA to the FBI under the MOU produced in response to item A of the request.

(42)    In the event the court were to deem the 59 pages responsive to Plaintiff's request, they are exempt from disclosure pursuant to FOIA Exemption (b)(7)(E).  FOIA Exemption (b)(7)(E) would be asserted to protect the pages at issue, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.  This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures. In this instance, disclosure of this information would allow individuals to know the capabilities of the NICS as well as the standard operating procedures CJIS personnel use to conduct NICS operations. This knowledge could allow individuals to individuals to adjust their behavior accordingly in an attempt to circumvent the NICS and therefore reduce the system's effectiveness in checking available records on persons who may be disqualified from receiving firearms. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(E) in the event the court deems the information responsive to Plaintiff's request.

## PROCEDURAL HISTORY OF CONSULTATION FROM OIP

(43)    On November 9, 2018, the FBI received a 19-page DOJ document containing FBI equities from OIP for review and consultation.  This document, DOJ's guide titled "Guidance to Agencies Regarding Submission of Relevant Federal Records to the NICS" (herein "DOJ's

NICS Guide"), was located by VA during the processing of Plaintiff's request submitted to VA. Upon its review of this document, the FBI applied redactions pursuant to FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(E).  On November 27, 2018, the FBI returned the document to OIP for release to Plaintiff.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

### EXEMPTION 7 THRESHOLD

(44)     Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate the records or information at issue were compiled for law enforcement purposes.  Pursuant to 28 USC §§ 533, 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM") and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States.  Under this investigative authority, the FBI operates NICS to ensure those lawfully prohibited from purchasing firearms do not do so, allowing the FBI to assist in preventing crimes of violence involving firearms.  The responsive record at issue, DOJ's NICS Guide, was compiled by DOJ as guidance for law enforcement agencies (DOJ agencies) to submit law enforcement information to a law enforcement database (NICS), with the core purpose of assisting in preventing crimes of violence involving firearms.  Therefore, this information was clearly created for a law enforcement purpose allowing for the application of Exemption 7.

### EXEMPTIONS 6 AND 7(C) –UNWARRANTED INVASION OF PERSONAL PRIVACY[19]

---

[19] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C).

(45)     U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."

(46)     In withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interest of the individual mentioned in this record against any public interest in disclosure. For purposes of this analysis, a public interest exists when information would shed light on the FBI's performance of its mission to protect and defend the United States against terrorists and foreign intelligence threats; to uphold and enforce the criminal laws of the United States; and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In the instance detailed below, where information was withheld pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI determined the individual's privacy interest outweighed the public interest, if any, in the information.[20]

## (b)(6) and (b)(7)(C)   Name and/or Identifying Information of FBI Support Personnel

---

Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions. As used in this declaration, the term "identifying information" includes, but is not limited to, Social Security numbers, date of birth, telephone numbers, and/or other personal information.

[20] As used in this declaration, the term "identifying information" includes, but is not limited to, Social Security numbers, dates of birth, telephone numbers, and/or other personal information.

(47)     Within DOJ's NICS Guide, the FBI protected the name and identifying

information of an FBI support employee on page 15. This support employee was assigned to

handle tasks related to submission of data to NICS. He or she was, and possibly is, in a position

of access to information regarding official law enforcement investigations, and therefore could

become a target of harassing inquiries for unauthorized access to investigations and/or FBI

investigative data if his/her identity was released. Thus, this individual maintains substantial

privacy interest in not having his/her identity disclosed in this context, whether or not he/she is

currently employed by the FBI. In contrast, the FBI concluded no public interest would be

served by disclosing the identity of this FBI support employee to the general public because

his/her identity would not, itself, significantly increase the public's understanding of the FBI's

operations and activities. Accordingly, after balancing this employee's substantial privacy

interest against the non-existent public interest, the FBI properly protected the name and

identifying information of this support employee pursuant to Exemptions (b)(6) and (b)(7)(C).

### EXEMPTION 7(E)-INVESTIGATIVE TECHNIQUES AND PROCEDURES

(48)     5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> law enforcement records which would disclose techniques and
> procedures for law enforcement investigations or prosecutions,
> or would disclose guidelines for law enforcement
> investigations or prosecutions if such disclosure could
> reasonably be expected to risk circumvention of the law.

(49)     This exemption affords categorical protection to techniques and procedures used

in law enforcement investigations; it protects techniques and procedures that are not well-known

to the public as well as non-public details about the use of well-known techniques and

procedures.

(50)     The FBI applied Exemption (b)(7)(E) on pages 17 and 18 of DOJ's NICS Guide

20

to protect a sensitive internal law enforcement email address utilized by the FBI to pursue its law

enforcement mission by receiving information from DOJ component agencies for inclusion in

NICS.

**(b)(7)(E):**     **FBI Sensitive Law Enforcement Email Address**

(51)     Within DOJ's NICS Guide, the FBI protected a sensitive internal FBI email

address used to receive NICS related communications pursuant to Exemption (b)(7)(E).  The

existence of internal email address usage is known, but not this specific email address used by

the FBI on a daily basis.  With the current emerging news of data breaches and other hacking

attempts, it is highly likely the release of this type of information could allow criminals to exploit

the FBI's Information Technology ("IT") system.  Criminals could use this information to gain

unauthorized access to internal law enforcement communications, review and manipulate data,

or otherwise interfere with the FBI's internal communications and disrupt official FBI business.

Such disruption could greatly reduce the FBI's and its law enforcement partners' abilities to

enforce firearms-related laws and impede NICS' law enforcement function.  Unauthorized access

by individuals would allow them to 1) manipulate or alter data submitted by authorized local,

state, or federal agencies to NICS and as a result impede the law enforcement function of NICS,

hindering local, state, or other federal law enforcement agencies' ability to enforce firearms-

related laws; 2) pose as authorized local, state, or federal agencies and submit inaccurate and/or

false information on behalf of these agencies to NICS and as a result impede the law

enforcement purpose of NICS;  and/or allow them to inundate the internal, NICS-related email

inbox with a large volume of communications and as a result overload or slow down NICS'

internal communications, jeopardizing its law enforcement purpose.  Thus, release of this

information would enable criminals to circumvent the law and the FBI properly protected this

21

information from disclosure pursuant to FOIA exemption (b)(7)(E).

## CONCLUSION

(52)    The FBI conducted reasonable searches for responsible records.  By letter dated June 23, 2016, the FBI processed and released all material responsive to item A in full to Plaintiff.  The FBI inadvertently interpreted item B too broadly and corrected this issue upon reexamination of the material.  The FBI determined the material withheld in full is not responsive to Plaintiff's request. Moreover, CJIS, the FBI office most likely to possess responsive records, was unable to locate records responsive to this portion of Plaintiff's request.  Lastly, the FBI was also unable to locate responsive material related to the item C and advised Plaintiff of such by letter dated November 25, 2015.

(53)    Additionally, the FBI reviewed and applied redactions on a DOJ document as part of a consultation from OIP.  The FBI properly asserted Exemptions 6, 7(C), and 7(E) on the document to withhold exempt FBI information.  The FBI cannot segregate any of this withheld information further as to do so would constitute an unwarranted and clearly unwarranted invasion of an FBI employee's personal privacy; or would reveal information concerning an FBI investigative technique/procedure risking circumvention of the law.

(54)    Finally, Plaintiff's complaint alleges the FBI's improperly withheld 59 pages of material in full.  The FBI has now demonstrated that, in fact, this material is not responsive to Plaintiff's request, and that it has fully complied with all other parts of Plaintiff's request. Thus, Plaintiff's complaint is moot.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct, and that Exhibits A-J attached hereto are true and correct copies.

Executed this _10th_ day of December, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WATKINS LAW & ADVOCACY, PLLC          )
                                       )
        Plaintiff,                     )
                                       )
        v.                             )   Civ. A. No. 1:16-cv-01974-ABJ
                                       )
DEPARTMENT OF VETERANS AFFAIRS, et al., )
                                       )
        Defendants.                    )
_____)


**Exhibit A**

**Mcguinn, Lauren S. (RMD) (FBI)**

| | |
|---|---|
| **From:** | Seth Watkins <Watkins@adduci.com> |
| **Sent:** | Wednesday, October 21, 2015 11:15 AM |
| **To:** | FOIPARequest |
| **Subject:** | FOIA Request |

This is a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

On behalf of our requester client, we hereby request copies of the following records under FOIA, preferably provided to the requester's undersigned attorney in electronic format (pdf):

1. each Memorandum of Understanding entered into between the United States Department of Veterans Affairs ("VA") and the United States Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), concerning or relating to submission by the VA to the DOJ/FBI of information on persons to be prohibited from purchasing a firearm, including but not limited to: the Memorandum of Understanding Between the United States Department of Veterans Affairs and the Federal Bureau of Investigation Regarding the National Instant Criminal Background Check System, dated February 27, 2012 (including all amendments, supplements, exhibits, and addenda thereto);

2. all records (including all amendments, supplements, exhibits, and addenda thereto) which set out or reflect the providing of information (such as names of individuals) by the VA to the DOJ/FBI for inclusion in the National Instant Criminal Background Check System ("NICS"), including but not limited to the NICS Index Mental Defective Commitment File, including but not limited to any directive, guidance, policy, instruction, manual, procedure, guideline, standard, internal advice, message, checklist, flow chart, and/or memorandum with respect thereto;

3. to the extent the FBI itself has custody or control of such records, all communications made by or on behalf of the United States Attorney General ("OAG") to the VA requesting or requiring that the VA submit to the DOJ/FBI information on persons to be prohibited from purchasing a firearm, and all communications from the VA in response thereto (on information and belief, OAG made such a request to the VA in 1998) (this request does not seek the subsequent communications that actually provide information concerning particular individuals).

NONE OF THE AFOREMENTIONED REQUESTS SEEK DISCLOSURE OF THE NAMES OF INDIVIDUALS PROVIDED BY THE VA TO THE FBI, NOR DO THEY SEEK ANY INFORMATION PROTECTED UNDER THE PRIVACY ACT.

We hereby consent to pay all costs incurred for search, duplication and review of materials up to $250.00. If additional costs will be required, please contact me for my approval.

If any records are withheld from release, please identify the withheld records by producing and providing to me an index pursuant to *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

1

If the FBI does not have custody or control over certain requested and responsive records but knows or believes that another component of DOJ subject to FOIA does, please forward this FOIA Request to the appropriate person and inform us that you have done so.

Please respond within 20 business days in accordance with 5 U.S.C. § 552(a)(6)(A).

If you have any questions about this request, please contact me immediately by the means listed below.

Thank you for your assistance with this matter.

Sincerely,
/s/
Seth A. Watkins

Seth A. Watkins, Ph.D.
ADDUCI, MASTRIANI & SCHAUMBERG LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Tel. 202-407-8647
Main FAX 202-466-2006
Email watkins@adduci.com

The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this email message in error, please email the sender at "watkins@adduci.com." Thank you.

**This message has been scanned for malware by Websense. www.websense.com**